COPY

ORIGINAL
FILED

MAR - 1 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  MARC J. FAGEL (Cal. Bar No. 154425)
   ROBERT S. LEACH (Cal. Bar No. 196191)
2    leachr@sec.gov
   ERIN E. SCHNEIDER (Cal. Bar No. 216114)
3    schneidere@sec.gov

4  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
5  44 Montgomery Street, Suite 2600
   San Francisco, California 94104
6  Telephone: (415) 705-2500
   Facsimile: (415) 705-2501

7

8                        **E-filing**

9

10           UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13

14  SECURITIES AND EXCHANGE COMMISSION,   Case No. CV

                                          CV11   0938
15           Plaintiff,

16        v.                              COMPLAINT

17  LAWRENCE R. GOLDFARB and BAYSTAR
    CAPITAL MANAGEMENT, LLC,
18
             Defendants.
19

20       Plaintiff Securities and Exchange Commission (the "Commission") alleges:

21                     **SUMMARY OF THE ACTION**

22       1.      Since at least 2006, Lawrence R. Goldfarb, a San Francisco Bay Area hedge fund

23  manager, and his company, Baystar Capital Management, LLC ("BCM"), have been misusing the

24  proceeds from one of their fund's highly profitable "side pocket" investments. Rather than return to

25  investors more than $12 million in proceeds that belonged to the fund, Goldfarb and BCM instead

26  secretly diverted the cash to other entities Goldfarb owned and controlled. Ultimately, they diverted

27  approximately $6 million to a separate real estate fund, $2 million to a San Francisco record

28  company, and another $3 million to various other private companies. None of these transactions were

                              1
                                                    SEC v. GOLDFARB, ET AL.
                                                           COMPLAINT

1   authorized by the fund's offering documents.  Goldfarb also deposited proceeds from the side pocket
2   investment into the bank account of one his related entities, which he used to pay for unauthorized
3   personal expenses including entertainment and charitable donations.

4       2.      For more than four years now, investors repeatedly have asked Goldfarb and BCM
5   about the status of their investment and when they will be repaid.  Goldfarb and BCM, however,
6   concealed their fraud by distributing to investors false and misleading account statements and written
7   updates, all of which failed to disclose the significant profitability of the original investment and the
8   misuse of the proceeds.  As of the date of this complaint, Goldfarb and BCM still have failed to repay
9   investors the money they are owed.

10      3.      The Commission seeks an order enjoining Goldfarb and BCM from future violations
11  of the securities laws, requiring them to disgorge ill-gotten gains with prejudgment interest, and
12  requiring Goldfarb to pay a civil monetary penalty.

13              **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

14      4.      The Commission brings this action under Sections 209 and 214 of the Investment
15  Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9 and 80b-14].

16      5.      This Court has jurisdiction over this action under Sections 209 and 214 of the
17  Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

18      6.      Venue in this District is proper under Section 214 of the Advisers Act [15 U.S.C.
19  § 80b-14] because defendants Goldfarb and BCM reside in, and a substantial portion of the conduct
20  alleged in this complaint occurred within, the Northern District of California.

21      7.      Assignment to the San Francisco Division is appropriate pursuant to Civil Local Rules
22  3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred,
23  among other places in this District, in Marin County.

24                      **DEFENDANTS**

25      8.      Lawrence R. Goldfarb, age 52, resides in San Anselmo, California and since 2001 has
26  served as a managing manager of Baystar Capital Management, LLC, the investment adviser to a
27  private investment fund, Baystar Capital II, L.P. As of the date of this Complaint, Goldfarb also ran

28

SEC v. GOLDFARB, ET AL.
COMPLAINT

1  LRG Capital, LLC, which promotes itself as a global investment, banking, and advisory boutique.  In

2  testimony, Goldfarb asserted his Fifth Amendment rights and refused to answer the Commission

3  staff's questions about his management of Baystar Capital II, L.P.

4      9.      Baystar Capital Management, LLC ("BCM") is a Delaware limited liability company

5  formed in 1998 with its primary place of business in Larkspur, California.  It acted as the investment

6  adviser and general partner for various investment partnerships, including Baystar Capital II, L.P.

7  Since 2005 and continuing through the present, Goldfarb has been the sole managing member of

8  BCM.

9                        **OTHER RELEVANT ENTITIES**

10      10.     Baystar Capital II, L.P. ("Baystar II" or "Fund") is a Delaware limited partnership

11  formed September 24, 2001 with its primary place of business in Larkspur, California.  BCM is its

12  investment adviser and general partner.

13      11.     IFI Capital, LLC ("IFI") is a Delaware limited liability company formed by Goldfarb

14  in May 2005.  Goldfarb was the sole member; he canceled its registration in October 2006.

15                        **FACTUAL ALLEGATIONS**

16  **A.      Background**

17      12.     In approximately 2003, Goldfarb formed Baystar II, a hedge fund that invested in a

18  variety of public and private companies.  At its peak in 2004, the Fund had assets in excess of $100

19  million.  Fund investors primarily included wealthy individuals and other large private investment

20  funds.  BCM served as Baystar II's general partner and investment adviser.  Since 2005, Goldfarb has

21  been the sole managing member of BCM.

22      13.     Baystar II's partnership agreement, which Goldfarb signed, included provisions for

23  accounting for certain types of investments as "side pocket" investments.  Side pocket provisions

24  commonly are used by hedge funds to allow them to separate illiquid and/or hard-to-value assets from

25  the rest of a hedge fund's investments.  Side pocket investments generally only are redeemed upon

26  disposition of the assets in the side pocket.  This means that an investor withdrawing its investment

27  from a fund with assets invested in side pockets will only receive its pro rata share of the fund's side

28

3

1  pocket investment once the assets in the underlying side pocket have actually been sold or liquidated.

2  This helps ensure fairness by limiting an early-redeeming investor's ability to withdraw a

3  disproportionate share of the fund's liquid assets.

4      14.     Baystar II's partnership agreement required it to account for its side pocket

5  investments at cost, and allocate any gains or losses to investors' regular capital accounts whenever

6  such gains or losses were "realized or deemed realized." When a realization occurred, gains were to

7  be allocated to investors' regular capital accounts within 30 days. When investors redeemed their

8  investments, they were entitled to the amounts in their regular capital accounts and the side pocket

9  investments were retained until there was a realization of the assets in the side pocket. Once realized,

10 side pocket investments were to be fully distributed within 30 days of realization.

11     15.     Baystar II's partnership agreement also required it to pay BCM an annual management

12 fee equal to 2% of the partners' capital accounts, including any side-pocketed assets. In consideration

13 for that fee, BCM was required to bear its own overhead costs and expenses and pay for news,

14 quotation and computer equipment and services, office space and utilities, administrative services,

15 and secretarial, clerical and other personnel. The partnership agreement also required Baystar II to

16 pay BCM an incentive fee which was comprised of 20% of the Fund's net capital appreciation and

17 20% of any gains realized or deemed realized on side-pocketed assets.

18     16.     Baystar II's offering memorandum, which Goldfarb and BCM provided to investors to

19 induce investments in Baystar II, stated that the partnership primarily would make short-term

20 investments in publicly traded companies and would, to a lesser extent, make equity investments in

21 select privately owned companies where the partnership's relationships with experienced industry

22 participants could be leveraged into profitable co-investment opportunities. It does not contain any

23 disclosures about the Fund's ability to enter into related party loans, other related party transactions,

24 or make debt investments in privately owned companies. Neither does Baystar II's partnership

25 agreement.

26

27

28

4

**B.      The Island Fund Investment**

17.      In approximately 2003, Baystar II made an $8.4 million investment in a limited liability company called Island Fund, which invested in large commercial real estate projects in the United States and elsewhere. Baystar II placed the Island Fund investment in a side pocket.

18.      In February 2004, Island Fund began making cash distributions to Baystar II. In May 2005, Goldfarb created IFI, a Delaware limited liability company of which he was the sole member. Goldfarb canceled IFI's registration with the State of Delaware in October 2006. In early 2007, even though it no longer was a valid legal entity, Goldfarb directed Island Fund to begin making cash distributions to IFI, rather than Baystar II, which was the entity owned by investors. Goldfarb also signed documents transferring the Island Fund interest from Baystar II to IFI, effective January 2005. Not until August 2010 did Goldfarb disclose to investors that he had transferred the Island Fund interest away from the Fund and away from the Fund's investors. Nor did he disclose to investors he directed Island Fund to make distributions to an entity he solely owned and controlled. Nor did he disclose to investors that he directed Island Fund to make distributions to an entity that was no longer a valid legal entity.

19.      In July 2008, Goldfarb's attorney warned Goldfarb that IFI did not exist and had no legal capacity to own any funds. Goldfarb failed to instruct Island Fund to stop making distributions to IFI.

20.      All told, Island Fund has made distributions to Baystar II, a wholly-owned subsidiary of Baystar II, and IFI totaling more than $16 million. Baystar II's investment in Island Fund had turned a profit by mid-2006. By that time, all of Baystar II's investors had redeemed their interests in the Fund. More than four years later, however, investors still are waiting for the pay-out of their Island Fund interests. The chart below details the distributions from Island Fund. It was not until more than one year after he became aware of the Commission's investigation – August 2010 – that Goldfarb disclosed to investors the full complement of Island Fund profit distributions.

| Date | Amount |
|---|---|
| February 2004 | $557,733 |

| Date | Amount |
|------|--------|
| July 2004 | $1,035,791 |
| January 2005 | $1,593,525 |
| April 2005 | $1,195,143 |
| July 2005 | $1,941,906 |
| January 2006 | $1,195,143 |
| June 2006 | $3,505,755 |
| August 2006 | $956,115 |
| January 2007 | $796,762 |
| April 2007 | $1,593,525 |
| August 2007 | $637,410 |
| January 2008 | $637,410 |
| October 2008 | $398,381 |
| 2009 | $0 |
| 2010 | $294,802 |

21.     As discussed above, Goldfarb directed Island Fund to make distributions to IFI beginning in early 2007.  However, he began depositing Island Fund distributions into IFI's bank accounts as early as April 2005.

22.     Goldfarb failed to disclose to Baystar II's third party administrator the full complement of Island Fund distributions.  For several years, the third party administrator asked for access to IFI's bank statements, but Goldfarb failed to provide them.  Accordingly, Baystar II's third party administrator, who distributed account statements to investors, did not know how much Island Fund cash had been distributed.

**C.     Goldfarb Misappropriated Investors' Island Fund Investment and Attempted to Cover Up His Fraud**

23.     From 2004 through August 2010, Goldfarb hid from investors the fact that Island Fund had made several cash distributions to the Fund.  Rather than disclose and distribute to investors the

6

1  Island Fund cash, Goldfarb instead used it to fund various projects such as a San Francisco record

2  company and a commercial real estate fund from which he extracted additional fees.  Goldfarb also

3  deposited the Island Fund distributions in the bank account of a related entity he solely owned and

4  controlled.  He used that account to pay for expenses that were not authorized by the Fund's

5  partnership agreement.

6       24.    For example, in 2008, Goldfarb transferred almost $5 million of the Island Fund cash

7  from IFI into the above-referenced bank account.  Goldfarb comingled in this account funds from

8  other business ventures.  He used this account, among other things, to pay for various personal

9  expenses including entertainment and charitable contributions as well as certain operating expenses

10  that were not authorized by the Fund's partnership agreement.  During 2008, the amounts Goldfarb

11  withdrew for unauthorized items exceeded the amount he deposited from his other business ventures.

12       25.    From 2008-2009, Goldfarb diverted approximately $6 million of the Island Fund cash

13  to another related party he solely owned and controlled, which in turn used the money to invest in a

14  commercial real estate fund which owns several properties in the San Francisco Bay Area.  Title to

15  the real estate is held by a wholly separate entity in which Goldfarb and others have an interest – not

16  by Baystar II – which is the fund owned by investors.

17       26.    From 2006-2009, through LRG Capital, Goldfarb diverted over $1 million of the

18  Island Fund cash to a San Francisco music company.  Goldfarb documented the transaction as a loan

19  from a related party he solely owns and controls – not from Baystar II.  Although Goldfarb has loaned

20  the San Francisco music company money on several occasions, it has never made any payments on

21  the loans.

22       27.    From 2007 through 2009, Goldfarb diverted an additional $3 million into other private

23  companies.  Goldfarb documented these transactions as investments owned by certain other related

24  parties he solely owns and controls – not Baystar II.

25       28.    In 2008, several years after he began misappropriating the Island Fund cash, Goldfarb

26  signed three promissory notes in favor of the Fund purporting to account for the Island Fund cash he

27  misused and attempting to create the impression that the investments described in paragraphs 25-27

28

SEC v. GOLDFARB, ET AL.
COMPLAINT

1  above were for the benefit of Baystar II. These notes were due in December 2010 and totaled

2  approximately $11 million. One of the notes is owed by IFI. As of the date of that note, IFI was no

3  longer a valid legal entity.

4     29.    Goldfarb and BCM then belatedly filed – several weeks after the Commission's staff

5  began investigating their activities – UCC financing statements purporting to secure the promissory

6  notes.

7     30.    All three promissory notes are owed by entities that are solely owned and controlled by

8  Goldfarb. As discussed above, none of these related party notes are authorized by Baystar II's

9  partnership agreement or its offering memorandum. To the contrary, the partnership agreement

10 requires Baystar II to distribute its side pocket investments to fully withdrawn partners within thirty

11 days of the realization of gains or losses in the side pocketed investments. Nor does the partnership

12 agreement or offering memorandum contain any disclosures about Baystar II's plan or ability to fund

13 the operations of related parties, or the conflict that arises from such related party investments. Nor

14 did Goldfarb disclose the related party notes to investors over a four year period from 2006 to 2010.

15    31.    These entities lacked the ability to repay the notes. Collectively, as of December 31,

16 2008, the entities had less than $2,000 in cash and minimal liquid assets. As of July 31, 2010, they

17 had less than $5,000 in cash. Financial statements produced by Goldfarb show that even the

18 underlying entities, like the real estate fund and the San Francisco music company, lost money in

19 2008 and 2009.

20    32.    Moreover, as of December 31, 2010, even though all of the notes were due, none of

21 the related party entities had repaid their notes.

22 **D.    Goldfarb and BCM Made False and Misleading Statements to Investors**

23     False Investor Statements

24    33.    Goldfarb and BCM for years intentionally concealed the Island Fund distributions

25 from Baystar II's investors. Every month, after they were approved by Baystar II, Baystar II's third

26 party administrator sent to Baystar II's investors statements detailing the value of their investment.

27 Even though Baystar II's investment in Island Fund had turned a profit by mid-2006, these statements

28

8

1    through November 2008 continued to report the Island Fund investment at cost. This meant that,

2    contrary to the provisions of Baystar II's partnership agreement, no Island Fund gains had been

3    allocated to the investors' regular capital accounts. Accordingly, investors were unable to determine

4    that the Island Fund investment was profitable and also were unable to determine that they were

5    entitled to request a distribution of their side pocket investments.

6         34.    In 2007, Baystar II's third party administrator proposed disclosing in the investors'

7    statements certain of the Island Fund distributions. (While Baystar II's third party administrator was

8    aware of some of the distributions, it was not aware of the full complement of distributions.)

9    Goldfarb, however, instructed the administrator to remove the reference to the Island Fund

10   distribution, thus hiding from investors the change in value and investment gains of the Island Fund

11   side pocket.

12        35.    In 2008, Baystar II's third party administrator again asked Goldfarb for IFI's bank

13   statements so that it could ensure it had properly accounted for the Island Fund side pocket including

14   all distributions made by Island Fund. Goldfarb, however, directed the administrator not to increase

15   the value of the Island Fund side pocket to reflect the Island Fund cash in part because he did not

16   want investors to ask for distributions.

17        36.    Goldfarb knew, or was reckless in not knowing, that the statements sent to investors

18   showed the Island Fund investment at cost. He also knew, or was reckless in not knowing, that these

19   statements he and BCM provided to investors did not accurately reflect the performance of the Island

20   Fund investment.

21              False Written Updates

22        37.    Beginning at least in 2007, investors started asking about the status of the side pocket

23   investments including how they had performed and when they would be returned to investors. In

24   response, Goldfarb failed to tell them about Island Fund's profitability. Nor did he tell them that he

25   had used the Island Fund distributions to fund other investments.

26        38.    Goldfarb also made affirmative misrepresentations in the written updates. For

27   example, Goldfarb directed his employees to inform inquiring investors that Baystar II was a passive

28

SEC v. GOLDFARB, ET AL.
COMPLAINT

1 investor and that it had no control over the sale of the underlying investments.  This was false

2 because, by this time, Goldfarb had full control over the majority of the then-underlying investments

3 which were not in Island Fund but instead were tied up in his related entities.  Goldfarb also directed

4 his employees to send investors false written updates stating that Baystar II would receive the

5 majority of its Island Fund profit distributions in the future.  In reality, it already had received a

6 significant portion of those distributions.

7       39.    In 2008, investors again asked for an update on the side pockets and the likely exit

8 timeframe.  Goldfarb directed his employees to falsely tell investors that nothing had changed since

9 the last updates in 2007.  To the contrary, Island Fund had distributed an additional $637,000 and he

10 had misappropriated millions more of the Island Fund cash.

11       40.    In 2010, an investor asked Goldfarb to provide him with a narrative about each side

12 pocket investment and the likely financial outcome of each.  Goldfarb's reply wholly omitted any

13 information about Island Fund's profitability or the identity and performance of the additional

14 investments he made with the Island Fund proceeds.

15       41.    Goldfarb knew, or was reckless in not knowing, that the updates and communications

16 he and his employees provided to investors were false and misleading.

17           False Financial Statements

18       42.    In 2009, BCM sent to Baystar II's investors compiled – not audited – financial

19 statements for the year ended December 31, 2008.  These financial statements did not disclose his use

20 of the Island Fund cash for personal expenses and for other investments.  The financial statements

21 also falsely stated that Baystar II's liquidation was imminent.  In reality, Goldfarb very recently had

22 signed promissory notes for loans that were not due until two years later.  And, they falsely stated that

23 the estimated net value of the Fund – which essentially was comprised of the promissory notes

24 discussed above – was $12.9 million.  In reality, however, none of these entities had sufficient cash to

25 repay these loans.

26       43.    Goldfarb and BCM knew, or were reckless in not knowing, that Baystar II's 2008

27 financial statements were false and misleading.

28

SEC v. GOLDFARB, ET AL.
COMPLAINT

1

### FIRST CLAIM FOR RELIEF
*Fraud by Investment Advisers in Advising Clients*
*(Violation of Sections 206(1) & (2) of the Advisers Act)*

2

3       44.     The Commission realleges and incorporates by reference Paragraphs 1 through 43.

4       45.     By engaging in the acts and conduct alleged above, Goldfarb and BCM, directly or

5 indirectly, through use of the means or instruments of transportation or communication in interstate

6 commerce or of the mails, and while engaged in the business of advising others for compensation as

7 to the advisability of investing in, purchasing, or selling securities: (a) with scienter employed

8 devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business

9 which operated or would operate as a fraud or deceit upon clients or prospective clients.

10      46.     By reason of the foregoing, Goldfarb and BCM have violated and, unless restrained

11 and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C.

12 §§ 80b-6(1) and (2)].

13

### SECOND CLAIM FOR RELIEF
*Fraud by Investment Advisers in Advising Pooled Investment Vehicles*
*(Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder)*

14

15      47.     The Commission realleges and incorporates by reference Paragraphs 1 through 46.

16      48.     By engaging in the acts and conduct alleged above, Goldfarb and BCM, directly or

17 indirectly, through use of the means or instruments of transportation or communication in interstate

18 commerce or of the mails, and while engaged in the business of advising others for compensation as

19 to the advisability of investing in, purchasing, or selling securities:  (a) made untrue statements of a

20 material fact or omitted to state a material fact necessary to make the statements made, in the light of

21 the circumstances under which they were made, not misleading, to investors or prospective investors

22 in a pooled investment vehicle; and (b) engaged in acts, practices, or courses of business that were

23 fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled

24 investment vehicle.

25      49.     By reason of the foregoing, Goldfarb and BCM have violated and, unless restrained

26 and enjoined, will continue to violate Section 206(4) of the Advisers Act and Rule 206(4)-8

27 thereunder [15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8].

28

SEC v. GOLDFARB, ET AL.
COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin Goldfarb and BCM from directly or indirectly violating Sections 206(1), (2), & (4) of the Advisers Act and Rule 206(4)-8 thereunder [15 U.S.C. § 80b-6(1), (2) & (4) and 17 C.F.R. § 275.206(4)-8];

II.

Order Goldfarb and BCM to disgorge any wrongfully obtained benefits, including prejudgment interest;

III.

Order Goldfarb to pay a civil penalty pursuant to Section 209 of the Advisers Act [15 U.S.C. § 80b-9];

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

V.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: March 1, 2011                    Respectfully Submitted,


_____
Erin E. Schneider
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

SEC v. GOLDFARB, ET AL.
COMPLAINT