JOHN W. COTTON (SBN 54912)
Email:  JCotton@gghslaw.com
GARTENBERG GELFAND HAYTON &
SELDEN LLP
220 Montgomery Street, 15th Floor
San Francisco, CA 94104
(415) 788-6230

Receiver of Baystar Capital Management, LLC
and Lawrence Goldfarb

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>              Plaintiff,<br><br>              v.<br><br>LAWRENCE R. GOLDFARB and BAYSTAR CAPITAL MANAGEMENT, LLC,<br><br>              Defendants. | Case No.:  C-11-0938 WHA<br><br>**FOURTH INTERIM REPORT TO THE COURT**<br><br>Date:        N/A<br>Time:        N/A<br>Judge:      William A. Alsup |

By this pleading, the Receiver in the above matter, John W. Cotton ("the Receiver"), reports for the fourth time to the Court on the progress to date of his administration of the Receivership estate ("the Estate") of the defendants. The Receiver was appointed on June 26, 2012, pursuant to this Court's order that charged him with administering the assets of the defendants Lawrence R. Goldfarb ("Goldfarb") and his wholly owned company Baystar Capital Management LLC ("Baystar") and related wholly owned corporations for the benefit of defrauded investors. The Receiver filed his first status report on October 10, 2012 for the first three (3) months of the Receivership, from July

through September 2012. The Receiver's second interim report covered the nine (9) months ending June 2013, one year after the Receiver's appointment. This third interim report covered the Receiver's activity from July 2013 to June 2014. This fourth interim report will cover the Receiver's activity from July 2014 until October 2015.

A.     The Securing of Estate Assets

As of the date of this report, all known assets of the Estate, with the two exceptions noted directly below, have been secured and reduced to cash. Previous reports to the Court have identified these assets in detail; together their liquidation resulted in $ 6,696,390 in cash coming into the Estate bank account at California Bank & Trust ("CB&T"). The bulk of those assets, $5,500,000, were distributed to the investors in May 2014.

1. LRG Capital

As the Court is aware, in April of this year, after approval by the three largest investors holding 93% of equitable interest in the Estate, the Receiver filed a motion to approve the sale of the illiquid investments of the Estate in the small, private fund known as LRG Capital, back to its general partner, After Court approval, this resulted in a final payment of $ 8,609 and the elimination of LRG Capital's illiquid partnership interest. This reduced the number of illiquid investments to the two reported below. The current amount of the remaining distributable assets in the estate at the time of filing this report is $794,019.00.[1]

2. The Island Fund and Yacht Fund

The two remaining obstacles to a final liquidation of Estate assets are those arising from the residual, passive investments of the defendant Baystar in

---

[1] The SEC previously posted approximately $90,000 with the Court Registry in 2012, which was received from defendant Goldfarb towards his disgorgement obligation before the Receiver was appointed. The SEC and the Receiver will shortly move the court by way of stipulation to have these funds returned to the Receiver for distribution to the defrauded investors as part of their final distribution. They are not included in the above balance.

(a) any remaining future random cash distributions from the Island Fund; and (b) any remaining future potential equity value in the Yacht Fund.[2] Both the Island Fund and Yacht Fund interests are private, limited partnership assets, themselves holding interests in a distressed corporate debt fund and the day-to-day operations of a global yacht docking and maintenance business, respectively. Because of the privately-held nature of these two entities, and their continued day-to-day operation by managing general partners over which the Receiver has no legal or practical control, without securing the agreement and cooperation of these general partners, the Estate cannot liquidate these two assets to present cash value for a timely distribution to investors. Moreover, as to the Yacht Fund which has never operated at an annual profit, and is only an equity position in a private corporation, any recovery of Baystar's original investment could require many years of waiting, during which time the Estate would have to stay open, accrue fees for maintenance and possibly watch the investment wither.

   In order to accomplish some resolution to the issue of liquidating these two assets to present value, the Receiver turned to the two largest investors for assistance. Since late 2014 and continuing to the present, and in full consultation with these large investors (who together hold 83% of the Receivership estate asset value), the Receiver has been holding sporadic discussions with the managing general partners of both privately held funds.[3] These discussions have been directed toward the possibility of selling the Baystar Capital LLC interests back to the limited or general partners of each fund for a discounted, current cash payment to the Estate.

---

[2] Glasshouse Technologies, in which the Estate held stock warrants expiring in June of 2015, filed for bankruptcy protection before expiration, making those warrants worthless to the Estate.

[3] The two largest Baystar investors, SAC Capital and SDS Capital, are themselves hedge funds with experienced senior management. A representative of each has been communicating with the Receiver on the issue of the valuation and possible liquidation of the Island and Yacht Fund interests.

FOURTH INTERIM REPORT TO THE COURT

The chief obstacle in proceeding with any meaningful discussions concerning a sale of these interests has been establishing their true value in present dollar terms. The Island Fund, which contains the remainder of a portfolio of CMBS's, or "collateralized mortgage bond" securities that were bundled and sold as separate investment securities by large Wall Street firms (such as Morgan Stanley) to various sophisticated investors, now only contains a few of the most distressed of its original assets.[4] Nonetheless, some of the CMBS obligors continue to pay down, or refinance their debt, allowing infrequent cash payments to the Island Fund limited partners.[5] These payments are sporadic, unpredictable and uneven in amount. It is therefor very difficult to "price" the current value of these old bonds. The Yacht Fund holds only one asset, 134,646 shares of Island Global Yachting IV Ltd ("IGY"). These shares were "estimated" by the Yacht Fund general partner in mid 2014 has having a possible value of between $2.20 and $2.80 per share. However, at the end of calendar 2014, IGY had a net loss of ($4,306,553). The general partner has recently advised that the losses have continued in 2015. As a result it is difficult to price the current value of this private equity, although it is likely it will be less that the previous estimated values from 2014.

The Receiver, in order to avoid the likely large cost to the estate of hiring an independent valuation firm, in late 2014 enlisted the support of experienced SAC and SDS personnel to assist in valuing the remaining CMBS positions and the IGY financials.[6] The theory behind this request to these two stakeholders is that (1) they routinely buy and sell illiquid investments and are

---

[4] According to both the Island Fund's general partner and the trading desk of SAC Capital, there are so few transactions in these remaining distressed bonds that giving them a reliable bid/ask spread is difficult.

[5] Indeed, since the last financial report to the Court, the Island Fund has made an additional $199,190 in payments to the Receiver.

[6] Both the Island Fund and Yacht Fund general managers have been helpful thus far in providing all financial information requested of them in order to make a valuation determination.

as well-positioned as any independent valuation firm to mark the Island Fund securities with a market value, and evaluate the income statements of IGY; and (2) to the extent they, as the largest beneficiaries of any Estate recovery are satisfied with that recovery, then the Receiver and this Court can be assured that any valuation arrived at for any sale is fair and acceptable as to them.

Arranging for this effort, however, has taken much longer than the Receiver originally anticipated.  The reasons for this are many, but in essence they involve scheduling, conferences and coordination with numerous personnel, including the general partners of both the Island Fund and Yacht Fund, as well as the representatives of SAC and SDS Capital. Unfortunately, notwithstanding the Receiver's persistent and continued efforts since mid 2014 to get a consensus view from the two largest investors, much time has obviously passed in bringing the valuation efforts to fruition. This has not been due to any delay on the part of the Receiver, but rather the schedules of the two largest investors. Notwithstanding the long delays the past year, within the past two weeks the Receiver has received approval from the two largest investors for going forward with a buy out proposal that would be satisfactory for both. Steps to accomplish this are now underway.

There is one unresolved legal issue with regard to the Yacht Fund if it is found to hold realizable value, which is whether there are additional Baystar Capital Management investors beyond those already identified by the Receiver in the Island Fund side pocket, who may have some entitlement to any Yacht Fund asset recovery. Documents provided to the Receiver from defendant Goldfarb's former business partner suggest that there may be as many as seven (7) additional Baystar investors who along with the dozen previously identified Island Fund investors, also invested in the Yacht Fund side pocket. If that is correct, there is some question as to whether and how much those investors might be entitled to recover. The likely percentage amount of entitlement of these seven appears to be insignificant in relation to the overall investment in

the Yacht Fund by the other Baystar investors who were also Island Fund investors, but nonetheless any entitlement to a distribution by them must be Investigated and resolved as part of the Receiver's final work.

B.    Current Financial Condition of the Receivership Estate

The Estate currently holds $794,019 in cash at CB&T, and the Court registry holds an additional $90,000. Other than unbilled time of the Receiver for work completed since February 4, 2015, which is approximately $10,000 and any amount that might be owed to any federal and/or local taxing authorities, there are no other known liabilities. [7] Based on the collections made by the Receiver, and the cost of operating the Estate for the past two years, the cost of the receivership to date has been less than 5% of the assets under his control.

C.    Future Work for the Receiver

The only significant, remaining work to be done by the Receiver concerns the disposition of the privately held assets referred to above. The residual value in the ongoing future operation of the Island Fund and the Yacht Fund needs to be established, and then if possible, negotiated with the approval of the largest investors into a present value, sum certain which would then be distributed. Since two of the three largest investors are informed and experienced fund managers themselves, presumably their assistance, input and approval in any negotiations with the general partners of the Island and Yacht fund partnerships, will assure an acceptable and quick resolution. Once that is accomplished, the Estate can be wound down and a final report submitted to the Court. It is anticipated that such a resolution and a final report might be

---

[7] Based on the preliminary view of the Estate's tax accountant, there will be no taxes due for 2015 as there is a significant tax loss carry-forward from the sale of the MREM real estate interest, along with the business expense payments to the creditors and the Receiver's firm for its work.

1  accomplished by the end of the first quarter of 2016, if not earlier, at which

2  time the Estate can be closed with a final distribution to investors.

3

4  Dated:  November 10, 2015          GARTENBERG GELFAND &
                                     HAYTON LLP
5

6

7                                    _____/s/ John W. Cotton_____
                                     John W. Cotton, Receiver for
8                                    Baystar Capital Management and
                                     Larry Goldfarb
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

FOURTH INTERIM REPORT TO THE COURT
